## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 08-MD-01916-KAM

IN RE: CHIQUITA BRANDS INTERNATIONAL, INC.
ALIEN TORT STATUTE AND SHAREHOLDER
DERIVATIVE LITIGATION

**This Document Relates to:**

**ATS ACTIONS**

**07-60821-CIV-MARRA**
**08-80421-CIV-MARRA**
**08-80465-CIV-MARRA**
**08-80508-CIV-MARRA**
**10-60573-CIV-MARRA**
_____/

### ORDER GRANTING IN PART & DENYING IN PART
### DEFENDANTS' JOINT CONSOLIDATED MOTION TO DISMISS

**THIS CAUSE** is before the Court on the Individual Defendants' Joint Consolidated

Motion to Dismiss the Plaintiffs' Amended Complaints [DE 735].[1]  The Court has carefully

reviewed the Motion, the Plaintiffs' Opposition to the Joint Motion [DE 820, 826] and

Defendants' Joint Reply [DE 903], together with the Defendants' individual supplemental

supporting memoranda [DE 731-733, 736-740], the Plaintiffs' responses to the individual

supplements [DE 822, 824-825, 827-831] and the Defendants' corresponding replies [DE 894-

898, 900-902].  Having done so, the Court has determined to grant the Defendants' Motion in

part and deny the Motion in part.

### I.    INTRODUCTION

The claims consolidated in this proceeding arise out of Chiquita Brands International, Inc.'s

alleged support of Autodefensas Unidas de Colombia ("AUC"), a violent right-wing paramilitary

---

[1] All docket citations in this Order refer to Case No. 08-MD-1916-MARRA (lead action).

group allegedly responsible for the kidnapping, torture and extrajudicial killing of Plaintiffs' family members during a prolonged period of civil unrest in the Republic of Colombia.  The gravamen of Plaintiffs' complaints is that between 1995 and 2004, Chiquita paid the AUC over $1.7 million to drive left-wing, anti-government guerilla groups out of the banana-growing regions of Colombia, to quell labor unrest and opposition to its operations and policies in these regions, and to prevent infiltration of banana-plantation unions by leftist sympathizers. By fueling the AUC, Plaintiffs allege Chiquita improved the AUC's financial situation and increased its ability to carry out its violent campaign and killing of civilians suspected of sympathizing with the guerillas, leading to the death of Plaintiffs' family members.

As against the newly-added Individual Defendants, Plaintiffs' allege that each of these senior Chiquita executives was involved in some aspect of initiating, implementing, reviewing and approving or concealing Chiquita's payments to the AUC,  acting with knowledge that the AUC was a violent terrorist organization which had unleashed  a systematic campaign of terror – death threats, extrajudicial killings, torture, rape,  kidnappings, forced disappearances and looting— against vast swathes of the Colombian civilian population as a means of undermining community and individual support for the left-wing guerrillas.   Plaintiffs contend the Individual Defendants knew that extrajudicial killings of civilians living in the banana-growing regions were a foreseeable consequence of Chiquita's support of the AUC from the outset, yet they participated in decision-making to continue AUC funding even after the United States government designated the AUC as a "foreign terrorist organization" ("FTO") and told Chiquita that its AUC payments were illegal.   Asserting aiding and abetting, conspiracy, agency and command responsibility theories of secondary liability, Plaintiffs seek to hold the Individual Defendants personally liable for compensatory and punitive damages under the Alien Tort Statute ("ATS"), 28 U.S.C. §1350,

the Torture Victim Protection Act of 1991 ("TVPA"), 28 U.S.C. § 1350 Note, state tort law and Colombian tort law.

The Individual Defendants have moved for dismissal of all claims. First, Defendants argue that Plaintiffs' ATS claims for "extrajudicial killings" and "crimes against humanity" are barred under the Supreme Court's opinion in *Kiobel v. Royal Dutch Petroleum Co.*, ___U.S. ___, 133 S. Ct. 1659 (2013), because all alleged relevant conduct occurred in Colombia, and Plaintiffs do not allege facts displacing or overcoming the presumption against extraterritoriality. Second, Defendants urge that Plaintiffs' TVPA claims for "extrajudicial killings" must be dismissed for failure to overcome the Act's exhaustion-of-local-remedies requirement.[2] Third, Defendants argue that those TVPA claims arising from acts of violence occurring more than ten years before the filing date of the complaints naming the Individual Defendants must be dismissed as time-barred.[3] Fourth, Defendants argue that all claims asserted by the Plaintiffs in the District of Columbia ("D.C.") and New Jersey ("N.J.") actions must be dismissed for lack of personal jurisdiction. Fifth, even if Plaintiffs' statutory claims survive these threshold challenges, Defendants maintain that the underlying factual allegations fail to state a plausible claim against them based on secondary liability under either the ATS or TVPA. Sixth, Defendants maintain that the state common law claims should be dismissed based on extraterritoriality. Finally, Defendants urge that the Colombian tort claims should be dismissed as time-barred as to the D.C. Plaintiffs, and for failure to allege the specific elements of each foreign law tort claim as to all Plaintiffs.

---

[2] In their initial Motion, the Individual Defendants also sought dismissal of the TVPA claims on the ground that the Act does not encompass secondary liability claims and does not apply extraterritorially. However, in light of the Eleventh Circuit's intervening opinion in *Doe v. Drummond, Inc*., 782 F.3d 576 (11th Cir. 2015), *cert. den*., __U.S. __, 2016 WL 763282 (Mar. 25, 2016),  foreclosing these arguments, the Defendants have withdrawn these challenges, eliminating the need for further analysis on either point.

[3] Defendants identify the Plaintiffs whose TVPA claims are allegedly time-barred in a thirty-nine page chart attached to their Motion to Dismiss [DE 735-1]. Over 3,000 individuals are included in this list.

## II.    PROCEDURAL HISTORY

Plaintiffs initially sued Defendant Chiquita Brands International, Inc. and Chiquita Fresh North America, LLC (collectively "Chiquita") in this District, the District of New Jersey and the District of Colombia in 2007 (*Carrizosa, Does 1-11*, *Does 1-144*), and again in this District in 2008 (*Valencia*) and 2010 (*Montes*). Plaintiffs sought damages under the ATS, the TVPA, state tort law and Colombian tort law based on Chiquita's financial and material support of the AUC – activity which allegedly strengthened the finances of the AUC and increased its ability to carry out its violent campaign of terror against large civilian populations in the banana-growing regions of Colombia.

These five cases were centralized in this multi-district litigation with four other lawsuits involving similar claims against Chiquita brought on behalf of thousands of Colombian nationals (collectively the "ATS Actions").[4]  On June 3, 2011, the Court ruled on Chiquita's consolidated motion to dismiss the first seven ATS actions under Rule 12(b)(6), finding: (1) the ATS claims for terrorism were not cognizable claims under international law; (2) the ATS secondary liability claims for war crimes, crimes against humanity, extrajudicial killing and torture sufficiently alleged violations of international law as well as Chiquita's secondary liability for those violations; (3) the TVPA claims for extrajudicial killing, torture, and crimes against humanity stated a plausible claim for relief; [5] (4) the civil tort laws of Florida, New Jersey, Ohio and the

---

[4] *Juan/Juana Does 1-914*, Case No. 08-CIV-80480 (New York); *Does 1-976*, Case No. 10-CIV-80652 (D.C.); Does *1-677*, Case No. 11-CIV-80404 (D.C.); *Does 1-254*, Case No. 11-CIV-80405 (D.C.).

[5] The Court applied a heightened *mens rea* standard for assessing the aiding and abetting liability allegations under the ATS and TVPA, requiring purpose or specific intent rather than simple knowledge: "Plaintiffs must allege more than the mere fact that Chiquita had knowledge that the AUC would commit such offenses… This requires that the complaints allege that Chiquita intended for the AUC to torture and kill civilians in Colombia's banana-growing regions … [DE 111, p. 69]. The Eleventh Circuit, however, interpreting the TVPA, has since held that the appropriate standard for aiding and abetting liability is "knowing substantial assistance." *Doe v. Drummond*, 782

4

District of Colombia do not apply extraterritorially to the conduct of Colombian paramilitaries against Colombian civilians which occurred on Colombian soil, as alleged in this case, and (5) the Court lacks subject matter jurisdiction over the Colombian law claims [DE 412]. *In re Chiquita Brands Int'l,* 792 F. Supp. 1301 (S.D. Fla. 2011) ("*Chiquita I*"). On a motion for reconsideration, the Court vacated its ruling on the Colombian law claims and reinstated these claims on the basis of diversity jurisdiction [DE 516].

The Court then granted Chiquita leave to pursue an interlocutory appeal of the rulings on the legal sufficiency of the ATS and TVPA claims [DE 518][6] and stayed the proceedings pending the outcome of that appeal [DE 587]. In the interim, the United States Supreme Court issued its decision in *Mohamad v. Palestinian Authority,* ___U.S. ___, 132. S. Ct. 1702 (2012), holding that the TVPA only allows claims against natural persons, and not corporations. Further, on April 17, 2013, the Supreme Court issued its decision in *Kiobel v. Royal Dutch Petroleum Co*., 569 U.S. ___, 133 S. Ct. 1659 (2013), holding that the presumption against extraterritoriality applies to claims under the ATS, and, as applied in the case before it, precluded an ATS action by a plaintiff suing foreign corporations for acts allegedly committed in Nigeria "in violation of the law of nations" and in collaboration with the government of Nigeria.

Ultimately, the Eleventh Circuit reversed this Court's order in *Chiquita I* and remanded with instructions to dismiss Plaintiffs' ATS claims under *Kiobel,* and to dismiss Plaintiffs' TVPA claims under *Mohamad. Cardona v. Chiquita Brands International*, 760 F.3d 1185, 1188-89 (11th Cir. 2014). With the dismissal of these claims, only the Colombian tort law claims –

---

F.3d 576, 608-609 (2015). The Court now applies that standard in assessing the viability of TVPA claims asserted against the Individual Defendants, discussed *infra*.

[6] Although not requested by the parties, the Court included in its certification a recommendation that the Eleventh Circuit also review the Court's dismissal of the Plaintiffs' state law tort claims on grounds of extraterritoriality.

currently the subject of a motion to dismiss on *forum non conveniens* grounds – remain pending against Chiquita.

After the Supreme Court issued its opinion in *Mohamad*, but before the Eleventh Circuit issued its ruling in *Cardona*, the Plaintiffs in four of the ATS actions (*Does 1-144*; *Montes*; *Valencia*; *Carrizosa*) were granted leave to amend their Complaints to add, as individual defendants, various current or former directors, officers and employees of Chiquita allegedly involved in forming, implementing and concealing Chiquita's decision to provide support to the AUC in Colombia [DE 556]. These groups filed amended complaints which now serve as the operative complaints in those actions.[7]  The New Jersey Plaintiffs were next allowed to amend their complaints in similar fashion.[8]  With the exception of these pleading amendments, the stay of proceedings otherwise remained in place during the pendency of the Eleventh Circuit's review of *Chiquita I* [DE 587].

In the *Valencia*, *Montes* and *Carrizosa* actions, Plaintiffs added two individual defendants – Cyrus Fredheim and Keith Lindner – asserting claims under the ATS, state tort law, and Colombian tort law.  In two of these cases (*Valencia* and *Montes*), Plaintiffs also included claims under the TVPA.

In *Does 1-11* ("N.J. Plaintiffs"),  Plaintiffs  asserted claims under the ATS, TVPA, state law and Colombian law against six individual defendants – Cyrus Fredheim, Roderick Hills,[9] Charles

---

[7] *Does 1-144* ("D.C. Plaintiffs") Third Amended Complaint [DE 575]; *Montes* Third Amended Complaint [DE 558]; *Valencia* Third Amended Complaint [DE 576]; *Carrizosa* Third Amended Complaint [DE 186/Case No. ___].

[8] *Does 1-11* ("N.J. Plaintiffs") Second Amended Complaint [DE 589].

[9] Since filing of the Amended Complaints adding Roderick Hills as an individual defendant, Mr. Hills passed away and his Estate has been substituted as a party defendant.  The Estate of Hills has joined in the Individual Defendants' consolidated joint motion to dismiss [DE 732], and has also submitted its individual motion to dismiss [DE 912] raising numerous grounds for dismissal unique to the Estate [failure to serve the Estate timely with substitution notice; survival of TVPA claims as to deceased defendant; survival of Colombian law claims as to deceased defendant] which has now been fully briefed [DE 929, 949]. Observing that some of the same probate

Keiser, Robert Kistinger, Robert Olson and William Tsacalis.  In *Does 1-144* ("D.C. Plaintiffs"), Plaintiffs asserted similar claims against these same six defendants, while adding two other individual defendants -- Fernando Aguirre and Steven Warshaw.

## III.   FACTUAL BACKGROUND[10]

The historical predicate for Plaintiffs' claims was detailed in *Chiquita I* and will not be repeated here, except to the extent relevant to explain and illustrate the respective roles allegedly played by the Individual Defendants charged with participation in Chiquita's AUC payments and support scheme.

### A.  The Factual Proffer: *United States v. Chiquita Brands International, Inc.*, Case No. 07-CR-055-RCL [U.S. District Court, District of Colombia] [DE 823-4]

Plaintiffs contend that they first became aware of Chiquita's support of the AUC and other terrorist organizations in March, 2007, when Chiquita pled guilty in the United States District Court of the District of Columbia to one count of engaging in transactions with a designated global terrorist and was ordered to pay a $25 million criminal fine [DE 575 ¶¶ 10, 2159].

In the context of those criminal proceedings, *United States v. Chiquita Brands International*, Case 07-CR-0555 (RCL) ("the criminal case"), Chiquita entered into a "Factual

---

arguments have apparently been lodged in a newly-filed case in the United States District Court for the District of Colombia, *Does v Hills*, Case No. 15-CV-01586 [the subject of a prior conditional transfer order to this District which has since been vacated by the Judicial Panel on Multi-District Litigation [DE 994]], the Court shall defer to the ruling of the D.C. Court on any overlapping probate issues. Accordingly, the Court reserves ruling on the Estate's motion to dismiss the amended complaints pending resolution of those issues in the D.C. litigation.

[10] This background is primarily derived from the non-conclusory factual allegations in the D.C. Plaintiffs' (*Does 1-144*) Third Amended Complaint [DE 575] – the pleading naming the largest subset of individual defendants -- which the Court treats as representative of the allegations charged against the Individual Defendants. As to defendant Keith Lindner, the factual background is drawn from the non-conclusory factual allegations in the Third Amended Complaints filed in the *Montes* action [DE 558], the *Valencia* action [DE 576] and the *Carrizosa* action [Case 07-60821/DE 186] -- the only cases in which Mr. Lindner is named as an individual defendant. For purposes of reviewing the instant motion, the Court accepts the allegations in these pleadings as true and construes them in the light most favorable to Plaintiffs. *World Holdings, LLC v. Federal Republic of Germany*, 701 F.3d 641, 649 (11th Cir. 2012).

Proffer," outlining the involvement of ten senior Chiquita executives – identified by pseudonym as "Individual A" through "Individual J" -- in the illicit funneling of money to terrorist organizations in Colombia. The D.C. Plaintiffs cite extensively to this document in their complaint and purport to connect Individuals "A" through "D" with certain of the Individual Defendants named in this suit [DE 575, ¶¶ 2035-2036] ["Proffer"] [DE 823-4].[11] This document, signed by Fernando Aguirre, Chiquita's then President and CEO, together with Chiquita's then general counsel, Eric Holder, supplies a summary description of each person's role in the AUC payment scheme after September 10, 2001, the date the AUC was formally designated a "Foreign Terrorist Organization." From September 10, 2001, the date of this well-publicized designation, through February 4, 2004, Chiquita made 50 payments to the AUC totaling over $825,000.00 [DE 575 ¶2211].

### B.   Roles of the Individual Defendants in Chiquita's AUC Payment Scheme

The respective roles of the Individual Defendants in forming, implementing, approving or concealing Chiquita's support of the AUC, partially drawn from the Factual Proffer in the criminal case, are described in the Plaintiffs' amended complaints as follows:

### (1) Charles Keiser

Charles Keiser is a former manager of Colombian operations for Chiquita. He is alleged to have personally met in Medellin with AUC leaders Carlos Castano and Raul Hasbun in 1997, and then brokered an agreement, on behalf of Chiquita, to pay money to the AUC through "convivirs" [12] in exchange for AUC's services in suppressing labor unrest and

---

[11] In early versions of Plaintiffs' Complaints, these ten individuals were referenced as "David Does 1-10." The D.C. Plaintiffs continue to refer to the as-yet unidentified persons as "David Does 5-10." [DE 575, ¶ 2035].

[12] After paramilitaries were declared illegal by the Colombian government, the government created a legal mechanism which allowed private groups to provide "special vigilance and private security services." These private groups, known commonly by the Spanish-language acronym "convivirs," were comprised of civilians who received permission from the government for a license to provide their own security in areas of high risk or in the public

driving leftist guerillas and sympathizers out of the banana-growing regions controlled by Chiquita [DE 575 ¶¶ 2202, 2208]. When Chiquita later abandoned the convivir cash-funneling system, Keiser allegedly made arrangements for cash to be paid to the AUC from his own personal accounts [DE 575 ¶ 2050].

**(2) William Tsacalis**

William Tsacalis is a former Controller and Chief Accounting Officer for Chiquita.   He allegedly knew about Chiquita's payments to left-wing guerilla groups, such as the FARC, and later learned about Chiquita's switch to support of right-wing guerilla groups, such as the AUC, made through convivirs,  by 1997 at the latest [DE 575 ¶ 2047].

Tsacalis allegedly approved the AUC payments through the convivir system, and later participated in creating a new system designed to disguise AUC  payments by routing them through "income contributions" made to Banadex executives, who were required to report and pay taxes on the income, while rerouting the cash directly to AUC members [DE 575 ¶ 2047].

**(3) Cyrus Freidheim**

Mr. Freidheim was Chairman of the Board of Directors of Chiquita from March 2002 through May 2004, and the Chief Executive Officer (CEO) of Chiquita from March 2002 through January 2004.  According to the D.C. Plaintiffs (*Does 1-144*), Freidheim is the executive referenced by pseudonym as "Individual A" in the Factual Proffer.

---

interest. Convivirs were permitted to use arms that were otherwise restricted to use by the military [DE 575 ¶ 2071]. In the Uraba banana-growing regions where Banadex operated, convivirs operated as a front for the AUC from their inception, and were managed by Raul Hasbun, a banana-plantation owner who initially operated as an intermediary between banana companies and the AUC, and who eventually became commander of the AUC Banana Block   [DE 575  ¶¶2073-2075].

During Freidheim's tenure, Chiquita made approximately 42 payments to the AUC totaling about $595,792.00 [DE 576, ¶¶ 72-73, 105, 108-109] [DE 489, ¶¶ 97-100, 102-16, 119-36].

After taking over as Chiquita's CEO in 2002, Freidheim was fully briefed on the AUC payment system and allegedly approved the AUC payments as well as procedures implemented to disguise the purpose and receipt of the payments [DE 575,¶ 2036][ DE 576, ¶¶ 14-16, 73-75, 77, 101-102] [DE 589, ¶¶17, 29].   He allegedly did so against advice of counsel,[13] [DE 575, ¶¶2147-48][DE 576, ¶ 78-79] [DE 589, ¶¶117-18], knowing that the AUC was a violent paramilitary organization and a designated foreign terrorist organization.

Freidheim was allegedly present at multiple company meetings where AUC funding was discussed [DE 576, ¶¶73, 75] [DE 589, ¶¶86, 88], including an April 3, 2003 Board of Directors meeting when the AUC's status as a foreign terrorist organization was reported and the Board agreed to disclose its payments to the U.S. Department of Justice [DE 575 ¶2148].   Shortly afterwards, Freidhiem allegedly expressed agreement with the sentiment of another Board member to "just let them sue us" [DE 575, ¶ 2036].

On April 24, 2003, Freidheim attended a meeting in Washington D.C. between Chiquita executives (Freidheim, Hills and Olson), outside counsel and officials from the United States Department of Justice at which DOJ officials advised that Chiquita's AUC

---

[13] According to the Proffer, beginning on or about February 21, 2003, outside counsel advised Chiquita, through comments directed to Individuals "C" through "I," that the payments were illegal and must stop.  Specific comments to this effect included: "Must stop payments,"  "Bottom line: CANNOT MAKE THE PAYMENT,"  "Advised NOT TO MAKE ALTERNATIVE PAYMENT THROUGH CONVIVIR," "General rule: Cannot do indirectly what you cannot do directly," "Duress defense can wear out through repetition. Buz [business] decision to stay in harm's way. Chiquita should leave Colombia." [DE 575 ¶ 2147 [DE 823-4 ¶56].

payments were illegal and could not continue [DE 575, ¶2148; DE 576, ¶79; DE 589, ¶118].

### (4) Roderick Hills

Roderick Hills, now deceased, was a former Chiquita Director and President of Chiquita's Audit Committee.  The D.C. Plaintiffs (*Does 1-144*) contend Mr. Hills is the person referenced by pseudonym as "Individual B" in the Factual Proffer.

Hills  was allegedly present during a discussion of Chiquita's AUC payment system at the April 23, 2002 meeting of Chiquita's Audit Committee.

Roughly a year later, on April 3, 2003, Hills and Robert Olson reported to the full Board of Directors that the AUC was a designated Foreign Terrorist Organization; Hills is credited with joining in the "just let them sue us" sentiment expressed by another Board member at or about the time of this meeting  [DE 575 ¶ 2037] [Proffer ¶¶ 59-60, 84].

Hills participated in the April 24, 2003 meeting in Washington, D.C. with the Department of Justice and outside counsel, and allegedly warned the government that enforcement of the law prohibiting AUC payments would result in a mass exodus of United States companies from Colombia [DE 575 ¶ 2053].  Hills continued to approve Chiquita's AUC payments after these meetings, while acknowledging in an email sent to other Board members on December 22, 2003,  "[w]e appear to [be] committing a felony."

### (5) Robert Olson

Robert Olson is a former Vice-President and General Counsel of Chiquita who joined the company in 1995.  According to the D.C. Plaintiffs (*Does 1-144*), Mr. Olson is the person referenced by pseudonym as "Individual C" in the Factual Proffer.

Olson allegedly learned about Chiquita's payments to convivirs by 1997, at the latest, and knew at or shortly after this time that convivirs passed the payments directly to AUC members [DE 575 ¶ 2038].

Olson allegedly reviewed and approved  new procedures designed to disguise AUC payments at a presentation made during the April 23, 2002 Audit Committee meeting.

Olson and another Chiquita official met on February 20, 2003 and discussed the discovery that the United States had designated the AUC as a foreign terrorist organization [DE 575 ¶ 2212]. Olson conferred with outside counsel in Washington, D.C., who advised, on or about February 21, 2003, that Chiquita's AUC payments were illegal and should immediately stop [DE 575 ¶ 2213].

Olsen was present at the April 3, 2003 meeting of Chiquita's full Board of Directors, when AUC's status as a designated foreign terrorist organization was reported to the Board.  According to counsel's notes, on April 4, 2003, Olson is credited with expressing the opinion to "just let them sue us, come after us" a sentiment allegedly echoed by defendant Hills and Freidheim [DE 575 ¶¶ 2038, 2205].

Olson was present at the April 24, 2003 meeting in Washington D.C. with outside counsel and officials from the U.S. Department of Justice when the government advised Chiquita that the AUC payments were illegal and must stop.  Olson allegedly misrepresented at this meeting that the law did not require Chiquita to stop making the payments.

Prior to the D.C. meeting, Olson had frequent contacts with Chiquita's outside counsel, and allegedly authorized them to make an anonymous disclosure of Chiquita's AUC

payments to the DOJ, while simultaneously pressuring counsel to change its advice that Chiquita could not continue making payments [DE 575, ¶¶ 2055-2056].

On December 4, 2003, Olson presented the Board with additional details regarding the continued AUC payments, prompting another Board member to respond, "I reiterate my strong opinion – stronger now – to sell our operations in Colombia."

### (6) Robert Kistinger

Robert Kistinger is a former President and Chief Operating Officer (COO) of Chiquita Fresh Group.   According to *Does 1-144*, Mr. Kistinger is the person referenced as "Individual D" in the Factual Proffer submitted in the criminal case.

Plaintiffs allege Kistinger was one of a group of Chiquita executives that originally approved payments to a left-wing guerilla group, the "FARC," in the late 1980s, and continued to approve those payments into the 1990's.

Kistinger allegedly began approving similar payments to convivirs in 1997, at the latest, knowing that the convivirs were a front for right-wing guerilla groups such as the AUC, yet continued to approve the payments, initially viewing the AUC as the "good guys." [DE 575 ¶2039].

On April 8, 2003 – five days after the Board meeting at which AUC's status as a foreign terrorist organization was reported -- Kistinger allegedly traveled to Chiquita's headquarters in Cincinnati and instructed two Chiquita employees to continue making the AUC payments.

### (7) Ferdinand Aguirre

Ferdinand Aguirre is the current CEO of Chiquita, a position held since January 2004. He is also Chairman of the Board of Directors, a position held since May 2004 [DE 575,

¶ 2049].  He allegedly knew about Chiquita's history of AUC payments at the time he took office, and personally approved the last payments made up through February 2004.

During a "60 Minutes" report broadcast by CBS News, Aguirre allegedly admitted that Chiquita hid the AUC payments so well that "if we hadn't gone to the Justice Department, we probably would not be talking about this whole issue.  No one would know about this" [DE 558 ¶1829].

Plaintiffs allege Aguirre ratified Chiquita's prior AUC payments by taking action to conceal them until forced to admit the payments in the process of signing the Factual Proffer on behalf of Chiquita in the criminal case [DE 575 ¶ 2049].

**(8) Steven Warshaw**

Steven Warshaw held various executive positions at Chiquita, including Chief Executive Officer, Chief Financial Officer, and Chief Operating Officer.  He was also a Director of the Board for approximately five years. Plaintiffs allege that Warshaw knew about payments made to convivirs by at least 1997, and learned of the connection between convivirs and the AUC by no later than 2000.  Warshaw allegedly approved the AUC payments [DE 575 ¶ 2048].

**(9) Keith Lindner**

Keith Lindner was President and Chief Operating Officer of Chiquita from 1989 to March 1997, and was Vice Chairman of the Board of Directors from March 1997 through March 2002 [DE 558 ¶ 1618] [DE 576 ¶ 12].

Lindner, acting together with Cyrus Fredheim,  allegedly conspired with each other and worked in concert with, participated in a  joint criminal enterprise with, acted as the principals of, employed and/or aided and abetted the violent terrorist organizations

14

responsible for Plaintiff's injuries, including the AUC  [DE 576 ¶ 14] [DE 186; Case 07-60821 ¶¶ 30-32].

## IV.    DISCUSSION

### A.  Standard of Review

When evaluating a Rule 12(b)(6) motion to dismiss,  a district court must accept the factual allegations of the complaint as true and construe them in the light most favorable to the plaintiff. *Ray v. Spirt Airlines, Inc.*, 767 F.3d 1220, 1223 (11th Cir. 2014).  To withstand the motion, the complaint must contain factual matter, assumed to be true, sufficient "to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 50 U.S. 544, 556 (2007)).

To state a plausible claim for relief, a complaint must contain sufficient non-conclusory factual allegations to allow the Court "to draw the reasonable inference that [Defendants are] liable for the misconduct alleged."  *Id.*at 678. Plausibility "does not impose a probability requirement," but it does require "more than a sheer possibility" that a Defendant has "acted unlawfully."  *Id.*  Plaintiffs need not include "detailed factual allegations," but the pleadings must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal,* 556 U.S. at 678.  On the other hand, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556, 127 S. Ct. 1955 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L.Ed.2d 90 (1974)).

### A.  Alien Tort Statute Claims

In *Cardona,* the Eleventh Circuit held that this Court lacked subject matter jurisdiction over the ATS claims against Chiquita under the Supreme Court's opinion in *Kiobel v. Royal*

*Dutch Petroleum Co.,* 133 S Ct. 1659 (2013) because all of the relevant conduct occurred in Colombia.   Finding the factual allegations of the Plaintiffs' complaints insufficient to overcome the presumption against extraterritoriality under the ATS, notwithstanding allegations tying some of the alleged misconduct to actions of Chiquita executives taken in the United States, the Eleventh Circuit directed the dismissal of all ATS claims against Chiquita based on lack of subject matter jurisdiction.  *Cardona*, 760 F.3d at 1189-90.

Defendants argue this same reasoning requires dismissal of Plaintiff's ATS claims against the Individual Defendants, which are premised on the same underlying tortious conduct committed by AUC members on Colombian soil allegedly acting in collaboration with high-level Chiquita executives operating from within the United States.   The Court agrees that the allegations of the Amended Complaints do not cure the pleading deficiencies outlined in *Cardona,* and, applying *Kiobel,* shall grant the Defendants' motion to dismiss the ATS claims against the Individual Defendants for lack of subject matter jurisdiction.

### B. State Law Claims

In *Chiquita I,* the Court dismissed Plaintiffs' state law tort claims against Chiquita on extraterritoriality grounds, finding that the relevant state laws cannot apply to claims "premised on acts by Colombian paramilitaries against Colombian civilians that occurred inside Colombia as part of Colombia's civil war,"  absent allegations that the conduct had, or was intended to have, a  "substantial 'effect'" within any of the relevant states, or that it pertained to matters of universal concern recognized by the community of nations [DE 412].

Although the Court *sua sponte* included this issue in its certification order to the Eleventh Circuit of Appeals [DE 518], and the issue was fully briefed by the parties in conjunction with Plaintiffs' cross-appeal of this item, the Eleventh Circuit did not address the issue in the course

of its interlocutory review. Upon careful consideration, this Court finds no reason to revisit its original analysis on the extraterritoriality of the state law claims, left undisturbed by the Eleventh Circuit in its interlocutory review of the ATS and TVPA claims.  Because Plaintiffs' state law claims against the Individual Defendants are identical in all relevant respects to the state law claims previously asserted against Chiquita, the Court now finds  Plaintiffs' state law claims against the Individual Defendants to be similarly barred on extraterritoriality grounds and shall accordingly dismiss these claims for lack of subject matter jurisdiction.

### C. The Torture Victim Protection Act Claims

**1.  The Defendants are not entitled to dismissal based on the affirmative defense of exhaustion of local remedies.**

The Individual Defendants move to dismiss Plaintiffs' claims for extrajudicial killings under the TVPA, first, on ground that Plaintiffs purportedly have other "adequate and available" remedies in Colombia that they have not yet exhausted.[14]

In effort to meet their "substantial" burden of proving the availability of alternative adequate remedies in Colombia, *Jean v. Dorelien*, 431 F.3d 776, 781 (11th Cir. 2005), Defendants cite to various bodies of extrinsic evidence presumably proffered to illustrate the amenability of the Individual Defendants to suit in Colombia, as well as the receptivity of Colombian authorities to claims arising out of AUC human rights abuses.[15]

---

[14]  The TVPA provides in relevant part that "[a] court shall decline to hear a [TVPA] claim … if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred."  28 U.S.C. § 1350 (2)(b).

[15]  In this vein, Defendants first cite to declarations of the Individual Defendants filed in March, 2015 expressing each defendant's conditional willingness to subject himself to the jurisdiction of Colombian civil courts, thus purporting to eliminate any personal jurisdictional impediments to foreign suits. Defendants also cite to expert witness testimony, filed in connection with defendants' separately-filed motion to dismiss on *forum non conveniens* grounds, describing tens of thousands of claims arising from the AUC's past misconduct asserted by other Colombians through Colombia's "Justice and Peace Law" (enacted in 2005) and "Victim's Law" (enacted in 2011). Further, Defendants maintain that the Colombian government has routinely prosecuted, convicted and sentenced both former AUC members and government officials linked to human rights abuses committed by paramilitaries –

Defendants contend that the instant motion to dismiss is properly determined by reference to such extrinsic evidence because the TVPA exhaustion provision is jurisdictional, providing a basis for dismissal under Rule 12(b)(1).   In advancing this procedure, defendants rely on authorities embracing the general proposition that a district court may consider extrinsic evidence, such as deposition testimony and affidavits, when a defendant raises a factual attack on subject matter jurisdiction.  *See e.g. Carmichael v. Kellogg, Brown & Root Services, Inc*., 572 F.3d 1271 (11th Cir. 2009).  For their part, Plaintiffs proffer competing extrinsic factual evidence touching upon the availability, adequacy and futility of local remedies in Colombia,[16] advancing a two-step procedure for resolving any factual conflicts drawn from *Turner v. Burnside*, 541 F.3d 1077 (11th Cir. 2008), a § 1983 case outlining the procedures for resolving factual disputes arising from assertion of the defense of failure to exhaust administrative remedies under the Prison Litigation Reform Act (PLRA).

In *Turner*, the Eleventh Circuit held that the defense of failure to exhaust administrative remedies under the PLRA is treated like a defense for lack of jurisdiction, for procedural purposes, while it is not in fact a jurisdictional matter.  *Id.* at 1082.  The parties do not cite, nor

---

implying these governmental authorities would likely be receptive to holding the AUC's alleged American sponsors accountable for their part in fueling the AUC abuses should local remedies be pursued against them.

[16] Plaintiffs do not purport to have  exhausted local remedies, but rather, drawing from extrinsic evidence proffered in their opposition to  Defendants' motion to dismiss based on *forum non conveniens*,  contend exhaustion is excused  because  local remedies are unobtainable, ineffective, inadequate or obviously futile.  *See e.g. Doe v. Qi*, 349 F. Supp. 2d 1258, 1319 (N.D. Cal. 2004) (excusing exhaustion requirement under TVPA where complaint reveals that "those making allegations against the government could suffer serious reprisals); *Estate of Rodriguez v Drummond Co*., 256 F. Supp. 2d 1250, 1267-68 (N.D. Ala. 2003) (TVPA does not require exhaustion of local remedies where plaintiffs would be at risk of retaliation if they sought legal redress).

For example, Plaintiffs adduce proofs seeking to establish that Colombia's Justice and Peace program is not available to Plaintiffs to pursue civil monetary judgments against Chiquita or its executive officers; that  human rights activists in Colombia have long been targets of violent retaliation, forced disappearances and unpunished killings, a volatile climate which exists to this day in Colombia; and that there is no prospect that any civil judgments obtained in Colombian courts against Individual Defendant would be enforceable, defeating any meaningful sense of the  "adequacy" or "availability" of local remedies.

18

does the Court discern, any authority requiring the defense of failure to exhaust local remedies under the TVPA to similarly be treated, for procedural purposes, like a jurisdictional defense.

The Court therefore declines the parties' invitation to consider and weigh extrinsic evidence in assessing the viability of defendants' exhaustion defense at the motion to dismiss stage. Such an approach would run contrary to the Eleventh Circuit's announcement that "the exhaustion requirement pursuant to the TVPA is an affirmative defense," on which the defendant bears a "substantial" burden of proof. *Jean v. Dorelien*, 431 F.3d 776, 781 (11th Cir. 2005). An affirmative defense is not a jurisdictional requirement; "[i]t is a defense that may be pled in a case which is already within the court's authority to decide, and the ability of a party to assert such a defense has nothing to do with the court's power to resolve the case." *Douglas v. Yates,* 535 F.3d 1316, 1321 (11th Cir. 2008).

Because it is an affirmative defense, exhaustion of local remedies need not be pled in a complaint under the TVPA,  a Plaintiff's alleged failure to exhaust local remedies would not deprive the court of subject matter jurisdiction, *Cabello Barrueto v. Fernandez-Larios,* 291 F. Supp. 2d 1360 (S.D. Fla. 2003), *aff'd* 402 F.3d 1148 (11th Cir. 2005)*; Estate of Rodriguez v Drummond Co*., 256 F. Supp. 2d 1250 (N.D. Ala. 2003) (citing *Wiwa v Royal Dutch Petroleum Co*., 2002 WL 319887 at *55-56 (S.D.N.Y. 2002), and the matter is not properly resolved by reference to extrinsic evidence at the motion to dismiss stage. *Jara v. Nunex*, 2015 WL 8659954 (M.D. Fla. 2015) (truth of exhaustion of local remedies defense under TVPA is necessarily left for resolution at a stage in the proceedings where there is a complete evidentiary record). [17]

---

[17] In the PLRA context, the exhaustion of administrative remedies defense is treated like a defense for lack of jurisdiction, although it is not a jurisdictional matter; as a result, the resolution of a motion to dismiss for failure to exhaust administrative remedies in the PLRA context involves a two-step process permitting consideration of extrinsic evidence and rendition of specific factual findings in a two-step process at the motion to dismiss stage. *Turner v Burnside*, 541 F.3d 1077, (11th Cir. 2008)

In  certain limited situations affirmative defenses may be disposed of on the face of the pleadings by way of motion to dismiss, for example, where the facts respecting the affirmative defense are admitted on the face of a complaint, or are not controverted.  *Quiller v. Barclays Am./Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir. 1984);  *Larter & Sons v. Dinkler Hotels Co.*, 199 F.2d 854 (5th Cir. 1952).   In this case, however, Plaintiffs' Complaints do not, on their face, contain allegations clearly triggering application of the exhaustion-of-local-remedies defense. To the contrary, Plaintiffs affirmatively allege facts suggesting the existence of a basis for excusal, including a long-standing history of retributive violence in Colombia practiced against prosecutors, judicial officials and human rights defenders pursuing cases of human rights abuses against paramilitaries [DE 575 ¶¶ 6-9]. These allegations suggest the existence of disputed issues of fact on the adequacy and availability of Colombian local remedies which are not properly considered here, at the motion to dismiss stage, in deciding Defendants' entitlement to the affirmative defense of exhaustion.  *Jean v. Dorelein*, 431 F.3d 776, 783 n. 7  (criticizing district court for failing to require defendant to meet substantial burden of proof on exhaustion defense, noting that the matter had been raised by way of motion to dismiss and that "the disputed issues of material fact would have made summary judgment questionable as well"); *Doe v. Drummond Co.*, 2009 WL 9056091*16-17 (N.D. Ala. 2009) (exhaustion defense not appropriate for decision on motion to dismiss, where plaintiffs admitted they did not exhaust available remedies in Colombia, but alleged that seeking such redress would be futile  because those seeking to challenge official or paramilitary violence are at great risk of retaliation).

Plaintiffs admit that that they have not exhausted available remedies in Colombia, but allege facts suggesting such redress would be futile because of the ongoing risk of violent retaliation against civilians, judicial officers and human rights defenders seeking redress for

human rights abuses committed by the AUC.  This is enough to satisfy the Plaintiffs' burden at this stage of the proceedings.  Accordingly, the Individual Defendants are not entitled to dismissal based on the affirmative defense of exhaustion of local remedies.  *See e.g. Jara v. Nunez*, 2015 WL 8659954 (M.D. Fla. 2015).

**2.  The TVPA's ten-year statute of limitations does not bar claims arising out of killings which occurred more than ten years before filing of the Amended Complaints.**

Under the TVPA, Plaintiffs have ten years from the date their cause of action arose to bring suit for torture, extrajudicial killing and other torts committed in violation of the law of nations. *Cabello v. Fernandez- Larios*, 402 F.3d 1148 (11th Cir. 2005);  *Papa v. United States*, 281 F.3d 1004, 1012-13 (9th Cir. 2002).  This limitation is subject to equitable tolling in instances of "extraordinary circumstances" which are both beyond the plaintiff's control and unavoidable with diligence. *Cabello*, 402 F.3d at 1154; *Arce v. Garcia*, 434 F.3d 1254 (11th Cir. 2006); *Sandvik v. United States*, 177 F.3d 1269 (11th Cir. 1999).  Essentially,  the doctrine of equitable tolling allows a court to toll the statute of limitations until such time that it would have been fair for the statute to begin running on the claims.  *Arce* at 1261.

 In this case, the Individual Defendants assert that roughly 3,000 of the extrajudicial killings forming the predicate of the Plaintiffs' TVPA claims occurred more than ten years before the Individual Defendants were named as parties to these proceedings, and that these claims are therefore barred by the applicable statute of limitations on the face of the complaints.  Opposing the motion, Plaintiffs contend the allegations of the complaints support an equitable tolling of the statute, requiring that the motion for dismissal on limitations grounds be denied.

Whether the Defendants can prevail on their limitations defense at the motion to dismiss stage hinges on whether "it appears beyond doubt that [Plaintiffs] can prove no set of facts in support of [their] claim" that the statute of limitation should be equitably tolled.  *Beck v. Deloitte*

*& Touche*, 144 F.3d 732, 735-36 (11th Cir. 1998).   As the Court finds the Complaints do adequately describe plausible factual scenarios which would support an equitable tolling of the statute, the Defendants cannot prevail on their defense at this stage of the proceedings.

Plaintiffs allege that volatile political and social conditions in Colombia effectively precluded them from filing suit against the Individual Defendants until 2007 at the earliest, when Colombia instituted its Justice and Peace Program, encouraging the voluntary surrender of arms by paramilitaries in exchange for  limited immunity, and  AUC paramilitary units active in the banana-growing regions began to demobilize  [575 ¶¶ 12 - 15].   Before that time, paramilitaries engaged in widespread human rights abuses in these areas with impunity, brutally killing and threatening to kill union activists, human rights workers, suspected leftist sympathizers and other perceived critics during the time of the extrajudicial killings of Plaintiffs' relatives [DE 589, ¶¶228-229] [DE 575, ¶¶ 12-15].

These allegations adequately suggest the existence of "extraordinary circumstances" which would justify an equitable tolling of the statute until at least 2007, when Colombia began to emerge from its extended civil conflict and the extraordinary circumstances finally abated to a degree where Plaintiffs could pursue causes of action in the United States without fear.  Because the complaints allege facts which might justify an equitable tolling of the statute of limitations through 2007, there is no basis for dismissing the claims against the Individual Defendants on limitation grounds on the face of the pleadings.  *See generally Arce v. Garcia*, 434 F.3d 1254 (11th Cir. 2006); *Jean v. Dorelien, supra; Cabello Barrueto v. Fernandez Larios*, 291 F. Supp. 2d 1360 (S.D. Fla. 2002), *aff'd*, 402 F.3d 1148 (11th Cir. 2005); *Warfaa v. Ali*, 33 F. Supp. 3d 653 (E.D. Va. 2014).   The defendants' motion to dismiss the Plaintiffs' TVPA claims as facially time-barred shall accordingly be denied.

**3. With the exception of defendants Steve Warshaw and Keith Linder, Plaintiffs have alleged sufficient individualized facts stating plausible TVPA claims based on secondary liability as to all Individual Defendants.**

The TVPA authorizes a cause of action against '[a]n individual" for acts of extrajudicial killing and torture committed under authority of color of law of any foreign nation. 28 U. S. C. § 1350 Note.  By its terms, the Act contemplates claims based on secondary, or indirect, theories of liability. *Doe v. Drummond Co.*, 782 F.3d 576, 603 (11th Cir. 2015), citing *Mohamad v. Palestinian Authority*, 566 U.S. at ___, 132 S. Ct. at 1709; *Carballo v. Fernandez-Larios*, *supra*; *Aldana v. Del Monte Fresh Produce, N.A., Inc.,* 416 F.3d 1242, 1248 (11th Cir. 2005).

The Act defines "extrajudicial killing" as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." *Id.*  The Act defines "torture" as "any act, directed against any individual in the offender's custody or physical control, by which severe pain or suffering, whether physical or mental, is intentionally inflicted on that individual" for a number of different purposes.  *Id.*

In this case,  Plaintiffs allege  that each of the killings at issue was an "extrajudicial killing" in "violation of the law of nations" under the TVPA, and that the Individual Defendants are legally responsible  for those killings because they conspired with, aided and abetted or were engaged in joint actions with  AUC paramilitaries who carried out the murders.

The Individual Defendants contend that the TVPA claims should be dismissed for failure to state a claim on which relief may be granted because (1) Plaintiffs have not adequately pled aiding and abetting liability, where they fail to allege specific facts showing that each individual defendant intended, or had actual knowledge, that payments made to the AUC would lead to the murder of Plaintiff's relatives, and fail to allege facts showing "practical assistance" given by

each individual defendant to AUC members which had a "substantial effect" in furthering the AUC's the perpetration of the killings;  (2) Plaintiffs have not adequately pled conspiracy liability, where  they do not allege specific facts showing that each  individual defendant  had a "meeting of the minds" and  direct agreement with the AUC to provide financial support in exchange for the AUC's  services in the repression of left-wing influences and leftist union activity in the banana-growing regions of Colombia;  (3) Plaintiffs have failed to allege sufficient facts to connect AUC  paramilitary conduct with  "state action" as required under the TVPA.

As a threshold matter, the Court summarily disposes of the challenge to the sufficiency of the "state action" allegations, noting that allegations in predecessor complaints directed to this issue were parsed and analyzed at length in *Chiquita I*, and found adequate to plead the "state action" element of TVPA liability in the claims against defendant Chiquita [DE 412, pp. 36-45].  The allegations in the Plaintiffs' amended complaints do nothing to alter that analysis, which the Court adopts here to conclude that the allegations are sufficient to plead the "state action" element of TVPA liability in the claims against the Individual Defendants.  The Court's inquiry turns, next, to the sufficiency of allegations pertaining to the asserted secondary liability theories.

**a.  Standards for Aiding and Abetting Liability**

Theories of secondary liability under domestic law are available to support TVPA claims, with federal common law supplying the relevant standards.  *Doe v. Drummond*, 782 F.3d at 607-608.  Aiding and abetting liability is one such theory, which, in this Circuit, requires a showing of "knowing substantial assistance" to the person or persons who committed the wrongful act. *Id*., citing *Halbertsam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983).  Thus, to plead  aiding and abetting liability adequately, Plaintiffs must allege sufficient facts to show each Individual Defendant had the  requisite  "knowledge" *mens rea* and "substantial assistance" *actus reus*.

(1) *Mens rea*

To plead "knowledge" *mens rea* adequately, the Complaints must contain non-conclusory factual allegations from which it may reasonably be inferred that the Individual Defendants acted with knowledge that their participation in Chiquita's support of the AUC would facilitate the commission of human rights abuses by the AUC in the banana-growing regions of Colombia where Plaintiffs' relatives resided.

The allegations of the Amended Complaints, read in the light most favorable to Plaintiffs, support a reasonable inference that the Individual Defendants approved and continued to approve Chiquita's support of the AUC. This support was given in order to reduce the company's operating costs in the production of bananas, knowing that violent deaths of thousands of civilians in the banana-growing regions of Colombia would be at least a collateral by-product of its support, if not an intended result. This would further Chiquita's and the AUC's mutually-shared goal of suppressing driving left-wing sympathizers out of the banana growing regions of Colombia and suppressing labor union activity on the banana plantations which Chiquita controlled. These allegations support the further inference that the Individual Defendants condoned the AUC's use of violent terrorism in these regions because profits took priority over basic human welfare in the relevant decision-making processes.

Plaintiffs allege that the AUC targeted persons sympathetic to left-wing guerillas, including teachers, trade unionists, human rights defenders, religious workers, leftist politicians, as well as civilians who had no ties to the guerillas, but who were killed and tortured as a means of terrorizing and dominating the general civilian population. These allegations explain how the AUC's goal of eliminating left-wing guerilla influences and sympathizers benefitted Chiquita and coincided with its goals of suppressing labor opposition and maximizing profits on banana

production on plantations controlled by its Colombian subsidiary, Banadex, in the banana-growing regions.   From here, it may reasonably be inferred that the Individual Defendants -- as senior officers and executives of Chiquita charged with and rewarded for furthering its corporate mission -- obtained a direct benefit from the commission of violations of international law by the AUC in the banana-growing regions of Colombia.   This reasonable inference bolsters the allegation that each Defendant acted with the *purpose* of promoting the AUC's extrajudicial killings in those areas, as well as the *knowledge* that Chiquita's support would result in such killings.

Plaintiffs allege that all Individual Defendants knew the AUC was a violent paramilitary organization from the early days of Chiquita's relationship with it (by 1997 at the latest). Despite that knowledge, all Individual Defendants allegedly continued to participate in Chiquita's support of the AUC even after learning it had been formally designated a foreign terrorist organization in 2001, and being warned by the Department of Justice and outside counsel that Chiquita's AUC payments were illegal. One Board member -  Roderick Hills -- acknowledged at the end of 2003 that Chiquita's support of AUC appeared to be tantamount to a felony in light of these developments, yet he and other members of the Board allegedly continued their support of the AUC up through February 2004.

As to defendants Freidheim, Hills, Olson, Kistinger, Aguirre, Keiser and Tsacalis, Plaintiffs allege specific facts providing a reasonable basis for inferring their knowledge of the fact of Chiquita's payments to the AUC, as well as their knowledge of the status of the AUC as a violent terrorist organization engaged in rampant human rights abuses in the banana-growing regions controlled by Chiquita's Colombian subsidiary. As to these  Defendants, the complaints provide sufficient detail respecting their direct involvement in forming the illicit agreement with

AUC (Keiser), presence at Board meetings when the AUC payment subject was discussed in conjunction with AUC's status as an FTO (Freidheim, Hills, Olson); attendance at the Washington D.C. meeting where the DOJ and outside counsel specifically advised that AUC payments were illegal and must stop (Freidheim, Hills, Olson); support or participation in decisions to continue the payments despite this knowledge (Freidheim, Hills, Olson – the three alleged to concur in the  "just let them sue us" policy; Kistinger, who allegedly instructed employees in Cincinnati headquarters to continue payments five days after the Washington meeting;  Aguirre, who allegedly  approved continuation of the payments after taking over as CEO in 2002) and  involvement in activity designed to disguise or conceal the AUC payments (Olson, Tsacalis, Keiser).

These factual allegations support a reasonable inference that these Chiquita executives knew that their continued support of paramilitaries in Colombia would increase the likelihood of more human rights offenses and extrajudicial killings committed by the AUC in the banana-growing regions where plaintiffs' relatives resided, and support the inference that the Individual Defendants acted with purpose and knowledge that those offenses would occur.  The allegations are thus sufficient to state a claim for aiding and abetting the extrajudicial killings and torture even under a heightened "purpose" or "intent" *mens rea* standard, as well as the lesser "knowledge" standard applicable under the Eleventh Circuit's recent opinion in *Doe v. Drummond, supra.*

### (2) *Actus Reus*

As to these Individual Defendants, the complaints also allege sufficient acts of "substantial" assistance needed to satisfy the *actus reus* element of aiding and abetting liability.  The complaints  allege Chiquita's gratuitous  funding of AUC,  and concrete acts committed by each

of these Individual Defendants in the relevant decision-making which implemented, continued and concealed that support -- acts undertaken with knowledge that AUC funding would fuel continued human rights abuses and killings of civilians in the banana growing regions of Colombia where Plaintiffs relatives resided.

These alleged acts of decision-making by these Individual Defendants, acting from within the United States, caused substantial amounts of money and material support to be supplied to the AUC from 1995 to 2004, putting the AUC in a position to continue and intensify its terror campaign in the banana-growing regions long after it was formally designated a foreign terrorist organization by the United States. This activity readily meets the definition of "substantial assistance" for purposes of satisfying the *actus reus* element of aiding and abetting liability.

### (3) Defendants Warshaw and Lindner

As to Individual Defendants Warshaw and Linder, the amended complaints contain no allegations from which their alleged knowledge and approval of AUC payments, or concealment of payments, may reasonably be inferred. The conclusory allegations that these Defendants approved the payments, with knowledge of AUC's status as a violent terrorist organization are entirely lacking in any foundational factual support – for example, there is no information suggesting their presence at meetings at which the subject was discussed or participation in activity specifically designed to continue or conceal the payments from which such knowledge might be inferred. The conclusory allegations of knowledge and approval are insufficient, under *Iqbal*, to plausibly establish the requisite "*mens rea*" element or "*actus reus*" element of aiding and abetting liability.

### b. Conspiracy Liability

To prove an Individual Defendant indirectly liable by means of conspiracy, Plaintiffs must allege and prove (1) two or more persons agreed to commit a wrongful act (2) the defendant joined the conspiracy knowing of at least one of the goals of the conspiracy and with the intent to help accomplish it, and (3) one or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy. *Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005).

On the first element -- agreement -- Plaintiffs allege evidence of an agreement initially entered into in Colombia between defendant Keiser and AUC leaders, resulting in Chiquita's agreement to fund the AUC in exchange for the AUC's services in driving left-wing guerrillas and sympathizers out of the banana-growing regions of Colombia.  As to the second element, Plaintiffs allege that other  Individual Defendants – acting with knowledge of the AUC's status as violent terrorist group --   later  joined the conspiracy by approving and continuing to implement the AUC payment scheme, knowing of at least one of the unlawful goals of the conspiracy (i.e. the violent suppression of leftist sympathizers and innocent civilians in the banana-growing regions as a means of  intimidating and eliminating support for left-wing guerrillas antithetical to Chiquita's business platform in those regions), and acting with the intent to help accomplish that goal. Finally, the complaints allege that AUC killed thousands of civilians in banana-growing regions of Colombia where Plaintiffs' family members resided as part of its campaign to drive leftist sympathizers out of the region, and that AUC squads were in fact involved in the killings of Plaintiffs' family members.   Because this allegation describes acts taken in furtherance of the conspiracy, the complaints allege facts from which the third and

final elements of conspiracy liability may be established. That is, Plaintiffs allege sufficient facts which, if proven, could establish secondary liability based on conspiracy.

As to the subset of Defendants identified above, Plaintiffs plead facts from which it was foreseeable to these Defendants that civilians would be tortured and killed by the AUC.  It is also reasonable to infer from the allegations of the complaints that each of these Individual Defendants had actual knowledge that members of the conspiracy fueled with Chiquita support would continue to kill innocent civilians in the banana-growing regions of Colombia.   As to this group, then, the   complaints sufficiently allege facts from which it may be inferred each Defendant joined the conspiracy  with knowledge of the conspiracy's plan and with intent of helping it to accomplish its goals, which coincided with Chiquita's business objectives.   Finding facts sufficient to support the   secondary liability theory of conspiracy as to this subset of Individual Defendants, the motion to dismiss for failure to state a plausible claim of  secondary liability based on conspiracy shall be denied.

As to Defendants Lindner and Warshaw, the Court again finds the allegations  fall short of showing a plausible basis for inferring their knowledge of AUC's status as violent paramilitary group, or approval of Chiquita's support of it; accordingly, the complaints do not allege facts sufficient to show that these individuals joined the alleged conspiracy with knowledge of at least one of its illicit goals and an intent to further it.  All  secondary liability claims against Linder and Warshaw shall accordingly be dismissed.

### c.  Agency Liability

Because the Court finds sufficient allegations to support Plaintiffs' secondary liability theories of aiding and abetting and conspiracy liability, as to the above-referenced subset of

Individual Defendants,  it is not necessary to address Plaintiffs' alternative agency theories (ratification or command responsibility) asserted by certain Plaintiff groups**.**

> **4. The allegations of the complaints in the N.J. and D.C. actions are insufficient to establish personal jurisdiction over the Individual Defendants.**

The Individual Defendants named in *Does 1-11* (the New Jersey action) and *Does 1-144* (the District of Colombia action) contend that this Court's authority to exercise personal jurisdiction over them is defined by the law of the jurisdictions in which the cases were originally filed.  Observing that no Individual Defendant resides in New Jersey or the District of Colombia, Defendants argue that personal jurisdiction, if it exists, must be predicated on the exercise of long-arm jurisdiction under the respective statutes of the originating courts.  Arguing that these statutes do not support assertion of personal jurisdiction under the factual scenarios alleged, Defendants urge the dismissal of both actions for lack of personal jurisdiction.

More specifically, in the  District of Columbia action, Defendants argue that there is no basis for exercising long arm jurisdiction under D.C. Code § 13-423(a)(1) on theory that Plaintiffs' causes of action arise out of the Defendant's transaction of business within the District, urging that the August 24, 2003 D.C. meeting between Chiquita executives and Department of Justice officials described in the complaints falls under the "government contact" exception to this provision of the D.C. long-arm statute, thus precluding its invocation here. *See e.g. United States  v. Ferrera*, 54 F.3d 825, 831 (D.C. Cir. 1995).

As to the New Jersey action, although Chiquita is incorporated in New Jersey, Defendants correctly note that this is an insufficient basis, standing alone, on which to support the exercise of personal jurisdiction over any of its officers or directors. With Chiquita's headquarters and principal place of business during all relevant time periods located in the State of Ohio, and with no allegations of wrongful actions performed in or directed to the State of New

Jersey or the District of Colombia, the Individual Defendants contend the exercise of long-arm jurisdiction is not supported under either long-arm statute, requiring that both actions be dismissed for lack of personal jurisdiction.

The Court agrees that the amended complaints do not allege sufficient facts supporting the exercise of long-arm jurisdiction under either the D.C. or N.J. long-arm statutes, and further finds no compelling reason, at this juncture of the litigation, to grant Plaintiffs' alternative request for an opportunity to conduct jurisdictional discovery that might uncover evidence sufficient to support jurisdiction over the Individual Defendants in these jurisdictions.

With no premise for the exercise of long-arm jurisdiction, the Court considers Plaintiffs' alternative request that the actions be transferred, in the interest of justice, under either 28 U.S.C. §1406 or  28 U.S.C. §1631, to a district having  jurisdiction over the Defendants (which Plaintiffs contend would minimally include the districts of the Defendants' domicile), with direction that the actions be transferred back to this District pursuant to the  standing MDL Panel Order of consolidation.   As a further alternative, Plaintiffs propose that the  Court permit the litigation in the D.C. and N.J. actions to proceed in this District until conclusion of pretrial proceedings, and then,  pursuant to 28 U.S.C § 1407(a), remand the actions at that time to the original transferor courts which could then  transfer the cases to the appropriate district courts.

Defendants contend that 28 U.S.C. § 1407(a) prevents the Court from transferring the case to any district under the authority of  either 28 U.S.C. § 1406 [18] or 28 U.S.C. § 1631,[19] citing *Lexecon, Inc. v. Milberg Weiss*, 523 U.S. 26, 118 S. Ct. 956, 140 L.Ed. 2d 62 (1998).  In

---

[18] Section 1406 (a) provides in pertinent part that "the district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought..."

[19] Section 1631 states in pertinent part "Whenever a civil action is filed in a court … and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action …  to any other such court in which the action… could have been brought at the time it was filed ….."

*Lexecon,* the MDL transferee court in the District of Arizona, overseeing consolidated class actions arising out of a failed saving and loan, eventually dismissed the claims against Lexecon, one of the many defendants named in the proceeding.  Lexecon subsequently sued Milberg Weiss and other class counsel in the Northern District of Illinois, which, on order of the MDL Panel, transferred Lexecon's suit to the District of Arizona where the original  litigation continued.   The transferee court in Arizona  denied Lexecon's later  request  for referral of its case against Milberg Weiss to the MDL Panel  for remand back to the originating court in the Northern  District of Illinois,  and instead assigned the trial portion of the case to itself pursuant to 28 U.S.C. § 1404(a).

The Supreme Court held that this action violated the plain language of § 1407, which obliges *the Panel* to remand any pending case to its originating court when, at the latest, those pretrial proceedings have run their course.  *Id*. at 962.  It found that the district court accordingly had no authority to retain the case, instructing that "on any view of § 1407 (a), if an order may be made under § 1404 (a), it may be made after remand of the case to the originating district court." *Id* at 964; see also *id*. at 964 n. 4 ("[] we find the statutory language  of §1407 precludes a transferee court from granting any §1404(a) motion)."

28 U.S.C. §1407(a) provides in relevant part:

When civil actions involving one or more common questions of fact are pending in  different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings.  Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions.  Each action so transferred *shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated* ….

§ 1407 (a) (emphasis added).

In *Lexecon*, the Supreme Court concluded the  language of § 1407 unconditionally commands that any transfer actions be taken solely by the Judicial Panel on Multidistrict Litigation, 523 U.S. 26, 34-36 (1998), thus preventing the district court from effecting a transfer under §1404(a).   In this case, the Individual Defendants contend that the Supreme Court's interpretation of § 1407, as applied in *Lexecon* to §1404 (a) motions (*forum non conveniens* transfers), applies with equal force to §1406 (a) motions (transfers to correct improper venue) and §1631 motions (transfers to correct jurisdictional defects ).

The Court agrees,  and finds that § 1407(a), as interpreted in *Lexecon*, precludes this Court from ordering a transfer under either §§1406(a) or 1631 – either now or at the conclusion of pretrial proceedings --  in effort to cure the jurisdictional defect presented.  *See  Shah v. Pan American  World Service*, 148 F.3d 84 (2d Cir. 1998);  David Herr, Ann. Manual for Complex Litigation 4th Ed. § 20.132  at 265 n. 666 (Thomas Reuters 2014) (it follows from *Lexecon* that an MDL transferee judge may not transfer under Section 1406).

Rather than dismiss the complaints,  to avoid undue delay and prejudice to Plaintiffs posed by  potential time-bars which may  impede a  refiling of the complaints after dismissal, the Court has determined, in the interest of justice, to enter an order suggesting that the MDL remand the matters to the originating courts, pursuant to MDL Panel Rule 7.6(c),[20]  for the limited purpose of allowing Plaintiffs to attempt to cure the jurisdictional defects presented as to the   Individual Defendants by transfer to the district court(s) having jurisdiction over these Defendants.   In doing so, the Court recognizes that these cases will benefit from further coordinated proceedings as part of this MDL proceeding, and, in the event the jurisdictional

---

[20] Rule 7.6 (c) states: "The Panel shall consider remand of each transferred action … at or before the conclusion of coordinated or consolidated pretrial proceedings on (i) motion of any party, (ii) suggestion of the transferee district court, or (iii) the Panel's own initiative, by entry of an order to show cause, a conditional remand order or other appropriate order."

defects may be remedied on remand, remains amenable to a transfer of the cases back to this District for consolidation with the pending MDL proceedings.

**5.    Defendants are not entitled to dismissal of the Colombian law claims for failure to sufficiently plead elements of foreign law claims or, as to D.C. Plaintiffs, on statute of limitations grounds.**

Defendants do not contest the availability of Plaintiffs tort claims under Colombian law, but rather challenge Plaintiffs' failure to identify the legal elements of those claims. The Court finds that the claims under Colombian law adequately inform Defendants of the factual bases of the claims, and give adequate notice of Plaintiffs' intent to rely on foreign law as the bases of those claims. This is all that is required at the pleading stage; accordingly, Defendants' motion to dismiss the Colombian law claims in the *Does 1-11, Montes, Valencia* and *Carrizosa* actions for failure to state a claim shall be denied.

As to the claims of the D.C. Plaintiffs, *Does 1-144*, the Individual Defendants contend that the Colombian law claims are time-barred because they are subject to the statute of limitation of the District of Colombia, the forum in which Plaintiffs originally elected to assert those claims. Thus, Defendants contend that the Colombian claims for assault and battery are subject a one year statute of limitations, D.C. Code §12-301(4); the wrongful death claims to a two-year statute of limitations, D.C. Code §16-2702; and the remaining claims of negligence, negligent hiring, negligent supervision and intentional infliction of emotional distress to the District's general three-year statute of limitations, D.C. Code. § 12-301(8). Since all of the D.C. Plaintiffs' claims arise from injuries occurring prior to September 24, 2009 – three years before Plaintiffs filed their amended complaint adding the Individual Defendants – Defendants contend the Colombian law claims must be dismissed as time-barred.

In opposition,[21] the D.C. Plaintiffs contend, first, under application of D.C. law, that the wrongful death claims are properly governed by the Colombian statute of limitations, under which all claims are timely. Further, Plaintiffs contend that the existence of extraordinary circumstances justifies an equitable tolling of the statute of limitations on these claims as to all Individual Defendants, who have allegedly participated in a fraudulent concealment of their role in the perpetration of Plaintiffs' injuries. Additionally, in light of the anonymous identification of Chiquita executives implicated in the Factual Proffer filed in the criminal case, Plaintiffs allege that the concealment activity of the Individual Defendants extended even beyond that of Chiquita's, creating an even more compelling case for equitable tolling. Plaintiffs allege, finally, that their Colombian law claims "relate back" to the claims presented in the original filing in 2007 under Rule 15(c), because Plaintiffs were unable to identity the Individual Defendants by name in their original complaint, rising to level to the "mistake" clause of Rule 15(c)(1)(C)(ii). Furthermore, Plaintiffs contend that factual issues attendant to the timeliness of the complaints preclude disposition of the limitations defense by way of motion to dismiss.

The Court agrees, for the reasons previously discussed, that the factual allegations of the complaint plausibly suggest the existence of circumstances which might justify an equitable tolling of applicable statutes of limitations, including the limitation period which apply to the Colombian law claims of the D.C. Plaintiffs. On this basis, Defendants' motion to dismiss the Colombian law claims as time-barred shall be denied.

---

[21] The D.C. Plaintiffs addressed the statute of limitations defense in a separately filed opposition brief as to defendant Chiquita and the Individual Defendants. Case No. 08-80465 [DE 251].

## V.   CONCLUSION

Based on the foregoing, Defendants' Joint Motion to Dismiss Plaintiffs' Amended Complaints [DE 735: Case No. 08-MD-1916][22] is **GRANTED IN PART and DENIED IN PART** as follows:

1. The motion to dismiss the ATS claims is **GRANTED**.  Following *Kiobel* and *Cardona*, the ATS claims are **DISMISSED** for lack of subject matter jurisdiction on grounds of extraterritoriality.

2. The motion to dismiss the state law claims is **GRANTED**.  The  state law claims are **DISMISSED** for lack of subject matter jurisdiction on grounds of extraterritoriality.

3. As to the TVPA claims:

   a. The ruling on the motion to dismiss of Defendant Estate of Roderick Hills, by and through its Personal Representative, Carla Hills, is **RESERVED** pending resolution of overlapping probate issues in the D.C. action previously discussed;

   b. The motion to dismiss certain designated TVPA claims on statute of limitations grounds is **DENIED**;

   c. The motion to dismiss the TVPA claims of the D.C. Plaintiffs and N.J. Plaintiffs for lack of personal jurisdiction is **DENIED;**  the Court shall instead file a suggestion of remand to the JPML to the originating courts for consideration of transfer to the district court(s) with jurisdiction over the Individual Defendants named in these actions;

---

[22] This motion is cross-indexed at: [DE 223; 07-60821-CIV-MARRA]; [DE 192; 08-80421-CIV-MARRA] [DE 216; 08-80465-CIV-MARRA] [DE 185; 08-80508-CIV-MARRA] [DE 149; 10-60573-CIV-MARRA].

    d.   The motion to dismiss the TVPA claims for failure to exhaust local remedies is **DENIED**, and

    e.   The motion to dismiss the TVPA claims for failure to plead sufficient facts plausibly stating a claim for relief is **GRANTED** as to Defendants **STEVE WARSHAW** and **KEITH LINDER** only, and the  TVPA claims as against these  Individual Defendants are **DISMISSED** for failure to state a claim**.**  As to all remaining Individual Defendants, the motion to dismiss the TVPA claims for failure to plead sufficient facts plausibly stating a claim for relief is **DENIED.**

4.   The  motion to dismiss the Colombian tort law claims on statute of limitations grounds is **DENIED** as to the D.C. Plaintiffs.  The motion to dismiss the Colombian tort law claims as to all Plaintiffs for failure to plead all elements of underlying foreign law adequately is **DENIED.**

5.   The Individual Defendants are directed to file their Answers to the Plaintiffs' Amended Complaints within **TWENTY (20) DAYS** from the date of entry of this order.

6.   With regard to N.J. and D.C. actions included in this consolidated proceeding, Case No. 08-CV-80465-MARRA and Case No. 08-CV-80421-MARRA, respectively, the Court recommends that these actions be remanded by the Judicial Panel for Multidistrict Litigation to the transferor district courts, the United States District Court for the District of New Jersey and the United States District Court for the District of Colombia,  for a determination by the originating court on whether transfer to a jurisdiction having personal jurisdiction over the

Individual Defendants is appropriate under 28 U.S.C. §1404 or 28 U.S.C. §1631. The remand is respectfully suggested for the limited purpose of allowing Plaintiffs in these actions an opportunity to cure the identified jurisdictional defects through transfer to a court having jurisdiction over the Individual Defendants, with this Court's understanding and expectation that the cases may be transferred back to this Court, pursuant to the Panel's standing consolidation order, in the event that the jurisdictional defects are amenable to cure in this fashion.

7. It is further ordered that the Clerk of the Court provide a copy of this Order to the Clerk of the U.S. District Court for the District of New Jersey, the Clerk of the U.S. District Court for the District of Colombia, and the Clerk of the Judicial Panel for Multi-District Litigation.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 1st day of June, 2016.


_____
KENNETH A. MARRA
United States District Judge


cc. All counsel